# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| KIMBERLY SKAR, <br><br> *Plaintiff*, <br><br> vs. <br><br> SPIRIT AEROSYSTEMS, INC., <br><br> *Defendant*. | Case No. 08-2493-EFM |
| PEGGY DAWSON, <br><br> *Plaintiff*, <br><br> vs. <br><br> SPIRIT AEROSYSTEMS, INC., <br><br> *Defendant*. | Case No. 08-2494-EFM |
| ANN CONLEY and CHECOTAH LYDAY-MAYES, <br><br> *Plaintiffs*, <br><br> vs. <br><br> SPIRIT AEROSYSTEMS, INC., <br><br> *Defendant*. | Case No. 08-2495-EFM |

**MEMORANDUM AND ORDER**

This is an employment discrimination case. Plaintiffs, Kimberly Skar, Peggy Dawson, Ann Conley, and Checotah Lyday-Mayes, are African-American females who formerly worked for Defendant, Spirit Aerosystems, Inc. ("Spirit"). Plaintiffs were terminated after if it was discovered that they had had other employees clock them in in order to cover up the fact that they occasionally reported to work late. Believing that Defendant acted unlawfully toward them, Plaintiffs filed three actions. In the first case, Case No. 08-2493, Skar alleges that Defendant terminated her on the basis of race in violation of 42 U.S.C. § 1981 and 42 U.S.C. § 2000e-2 ("Title VII"), and sex in violation of Title VII. In the second case, Case No. 08-2494, Dawson alleges that Defendant terminated her on the basis of her race in violation of section 1981, Title VII, and K.S.A. 44-1001 ("KAAD"), and her sex in violation of Title VII. Additionally, Dawson claims that she was deprived of certain employment terms and conditions on the basis of her race in violation of section 1981 and Title VII.[1] In the third case, Case No. 08-2495, Conley and Lyday-Mayes allege that Defendant terminated them on the basis of their race in violation of section 1981. Defendant has filed a summary judgment motion in each of the cases. For the reasons set forth below, the Court grants Defendant's motions.

---

[1] In the introductory paragraph of her response to Defendant's summary judgment motion, Dawson states that her terms and conditions claim is also premised upon the KAAD. In the pretrial order, Dawson did not set forth a terms and conditions claim based on the KAAD. As a result, she may not now assert a KAAD terms and conditions claim. *See, e.g., Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) ("[C]laims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint.").

## I. BACKGROUND[2]

In June 2005, Defendant, Spirit purchased The Boeing Company's ("Boeing") commercial operations in Wichita, Kansas ("the Wichita facility"). Plaintiffs, Kimberly Skar, Peggy Dawson, Ann Conley, and Checotah Lyday-Mayes, African-American females who had worked for Boeing at the Wichita facility in the years leading up to the sell, were hired by Spirit to work on the fuselage for the Boeing 737: Skar, Conley, and Lyday-Mayes as sealers and Dawson as a sheet-metal assembler.

Shortly after taking over the Wichita facility, Spirit expressed its intention of eliminating Boeing's three minute grace rule, which had enabled employees to clock in up to three minutes after their shift began and still be considered on time, and requiring its employees to clock in by the time their shift was scheduled to begin. Wanting to make it appear that they had arrived at work on time, and thus avoid being disciplined for violating Spirit's punctuality rule,[3] Plaintiffs agreed to have others clock them if they were running late. For roughly the next year, Plaintiffs, through their participation in the scheme, were able to evade punishment despite being tardy a number of times. Plaintiffs claim that Defendant's managers and supervisors regularly observed their arrival at work, yet never spoke to them about punctuality.

---

[2] In accordance with summary judgment procedures, the facts are related in the light most favorable to Plaintiffs. As necessary, additional facts will be set forth in the Analysis section of this Order.

[3] Under Spirit's attendance and punctuality policy, an employee who arrives less than thirty minutes late on a regularly scheduled work day incurs one half of an occurrence. The required action for an employee who has received six occurrences within a twenty month period is termination.

On August 11, 2006, Spirit Security received a report from Spirit Ethics that Conley had offered to falsify the time records of two employees.[4] Based on this report, Spirit Security Investigator James Whittredge initiated an investigation. One of the first things Whittredge did was review the gate time and clock-in time records for Conley from June 21, 2006, through September 14, 2006. These records revealed that six times during that period Conley's clock-in time was earlier than her gate time, which usually should not happen because employees can clock in only after entering through one of the facility's gates. Whittredge next interviewed Conley. Initially, Conley denied that she had had other workers clock her in or that she had clocked in other workers. However, after she was confronted with the time records, she recanted and admitted that since June 2005 Skar and Lyday-Mayes had clocked her in before she had arrived at work and that she had done the same for Dawson, Lyday-Mayes, and Skar. Whittredge also interviewed the other plaintiffs. Like Conley, the remaining plaintiffs initially denied any wrongdoing. In fact, Dawson and Skar even submitted signed statements stating that they had never clocked in for anyone else and that they had never had someone else clock in for them. However, Plaintiffs eventually came clean: Lyday-Mayes after she was asked to tell the truth, Dawson after she was confronted with a report showing that her clock-in time was earlier than her gate time ten times between June 17, 2005, and November 2005,[5] and Skar on her volition. Lyday-Mayes admitted that she had clocked Conley in five times and that Conley had done the same for her on five different occasions. Dawson

---

[4]Plaintiffs claim that the Court should not recognize this fact because it is hearsay. The Court disagrees. In order to constitute hearsay, the statement in question must be offered to prove the matter asserted. *See* Fed. R. Evid. 801(c). Here, the information contained in the report is not hearsay because Defendant is offering it to show what was the cause of the subsequent investigation, not that Conley had actually offered to falsify the time records of the employees mentioned in the report.

[5]Whittredge looked at the clock-in report for this period of time, as opposed to the time right before he initially interviewed Dawson, because the clock-in records after Dawson became a temporary manager, which would have been in November 2005, were not available.

admitted that Conley had clocked her in a couple of times right after the divestiture, but denied clocking anyone in when they were not at work. Skar admitted that she had clocked in for Conley three or four times and that Conley had done the same for her three or four times.

Following his investigation, Whittredge prepared a report and submitted it to Spirit Human Resources, which had never faced a situation like the one described in Whittredge's report. Based on her review, which normally includes consideration of the security report, pertinent policies, the employee's prior work history, and similar cases, Deborah Vandegrift, a Human Resources employee, recommended to David Bartz, then a third-level manager and Director of Operations for the Boeing 737 fuselage assemblies, that Conley be terminated and that Lyday-Mayes, Dawson, and Skar be suspended. Bartz had been tasked with the duty of deciding the appropriate punishment because not all of the plaintiffs worked under the same second-level manager and one of the women, Dawson, was a manager and one, Conley, was a team leader. Bartz also had not previously faced a situation like the one presented in Whittredge's report.[6]

After reviewing Whittredge's report and meeting with Human Resources, Bartz concluded that all four women should be terminated because they had acted dishonestly and had committed time-clock fraud. Bartz's conclusion was consistent with Spirit's disciplinary guidelines, which provide that an employee may be terminated for acting dishonestly, falsifying time records, or completing another employee's time records. On October 9, 2006, Plaintiffs were terminated for committing time-record fraud. Dawson's position was filled by a white employee.[7]

---

[6]Since Spirit has taken control, Bartz has been the ultimate decision maker in a termination case only once – the occasion involving Plaintiffs.

[7]The record does not reveal who replaced the other three Plaintiffs.

At the time of Plaintiffs' termination, the available time records indicated that Conley's gate time was later than her clock-in time six times, Lyday-Mayes two times, and Dawson ten times. Apparently, no time records were pulled for Skar. Following Plaintiffs' termination, a supplemental record review was performed, which revealed that Conley's gate time was later than her clock-in time eighteen times, Lyday-Mayes nine times, Dawson ten times, and Skar ten times. For Conley, the discrepancy between the two times was fifteen minutes or less fourteen times. For Lyday-Mayes, the discrepancy was eight minutes or less eight times. For Dawson, the discrepancy was fifteen minutes or less eight times. For Skar, the discrepancy was ten minutes or less eight times. Plaintiffs claim that they always showed up for work when someone else clocked in for them. Furthermore, Conley, Lyday-Mayes, and Dawson allege that they always adjusted their time sheet to reflect the true number of hours worked, thus, they were never compensated for time they were not at work.[8]

During their tenure with Spirit, Plaintiffs were never subject to any disciplinary action, at least prior to their termination, and received good performance reviews. In fact, two of the plaintiffs, Dawson and Conley, were promoted: Dawson to a first-level manager position for the second shift in pre-integration, a new shift, and Conley to a team leader position. Despite their success with Defendant, though, Plaintiffs believe that they were treated differently than their peers who were white and male. For instance, Dawson claims that she was denied a team leader, i.e., a crew member who is tasked with additional job duties designed to assist the first-level manager, while every other first-level manager under Jim Hans, Dawson's second-level manager, received

---

[8] Employees use a different system for submitting their time for payroll purpose than they use for clocking in.

one, which, according to Dawson, caused her more stress and to work additional overtime. Conley alleges that she was occasionally referred to as the little black sealer by Defendant's employees.

Other than Plaintiffs, nineteen other employees have been disciplined for falsifying their time records – seven before Plaintiffs' termination and twelve after it. The seven employees disciplined prior to Plaintiffs' termination committed the following offenses and received the following forms of punishment: (1) a white employee submitted a time sheet that overstated the time she had worked by two days, and she received a written warning; (2) a white employee submitted two time sheets, which combined, overstated her work time by over four days, and she was terminated; (3) a white employee had excessive absences, incorrectly stated his work time, lied to his manager, and failed to meet the conditions of his Rehabilitation Agreement, and he was terminated after receiving two written warnings and a suspension; (4) a white employee overstated his work time by one hour, and he was given a written warning; (5) a white employee apparently had been overstating his work time for six months, and he was terminated; (6) a white employee apparently had been overstating his work time for months, and he was terminated; and (7) a white employee had overstated his work time numerous times, and he was given a written warning.[9] Apparently, in at least some of these cases, the investigatory process used was different than the one used against Plaintiffs.

In total, since taking over, Spirit has terminated twelve white employees for falsifying time records. However, none of the white employees that have been terminated, or disciplined in some other way for that matter, for falsifying time records were found to have clocked in for other employees or to have had other employees clock them in. Further, Bartz was not the decision maker in any of the cases involving white employees and a claim of time-record fraud.

---

[9]The parties have not provided the underlying factual background for the disciplinary actions taken after Plaintiffs' termination.

## II. STANDARD

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[10] "An issue of fact is 'genuine' if the evidence allows a reasonable jury to resolve the issue either way."[11] A fact is "material" when "it is essential to the proper disposition of the claim."[12] The court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.[13] The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.[14] To satisfy this burden, the moving party need not disprove the opposing party's claim; rather, he must simply point out the lack of evidence on an essential element of that party's claim.[15]

If the moving party carries its initial burden, the party opposing summary judgment cannot rest on the pleadings but must bring forth "specific facts showing a genuine issue for trial."[16] The opposing party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[17] "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits

---

[10] Fed. R. Civ. P. 56(a).

[11] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[12] *Id.*

[13] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[14] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003).

[15] *Id.*

[16] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[17] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000).

incorporated therein."[18] Conclusory allegations alone cannot defeat a properly supported motion for summary judgment.[19] The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."[20]

Finally, summary judgment is not a "disfavored procedural shortcut," but it is an important procedure " 'designed to secure the just, speedy and inexpensive determination of every action.' "[21]

### III. ANALYSIS

As stated above, all of the plaintiffs are asserting a wrongful termination claim and Dawson is asserting a terms and conditions claim. Plaintiffs' claims are based on 42 U.S.C. § 1981, which guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right in every state and Territory to make and enforce contracts . . . as is enjoyed by white citizens,"[22] Title VII, which prohibits an employer from "fail[ing] or refus[ing] to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin,"[23] and the KAAD, which makes it unlawful "[f]or an employer, because of . . . race, religion, color, [or] sex . . . to discharge [any] person from employment or to otherwise discriminate against such person in compensation or in terms, conditions, or privileges of employment."[24] For

---

[18] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

[19] *White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).

[20] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[21] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[22] 42 U.S.C. § 1981(a).

[23] 42 U.S.C. § 2000e-2(a)(1).

[24] *See* K.S.A. 44-1009(a)(1).

their claims, Plaintiffs "may proceed under either a 'mixed motives' theory, under which the employee must demonstrate that the employment decision 'was the product of a mixture of legitimate and illegitimate motives,' or a 'prextext' theory, under which the essential inquiry is whether the 'employer's stated reason for its decision is pretextual.' "[25] Based on the pretrial orders entered in the three cases, it appears that Plaintiffs have elected to utilize both theories for their claims.

### A. Wrongful Termination Claim

**Mixed Motives Theory**

To succeed on a mixed motives theory, Plaintiffs must show that " 'an impermissible motive played a motivating part in an adverse employment decision.' "[26] Plaintiffs contend that they have met their burden based on the following pieces of circumstantial evidence: (1) evidence that Defendant's policies were not followed during the disciplinary process; (2) evidence that Defendant treated Plaintiffs more harshly than their white counterparts who had engaged in substantially similar conduct; and (3) evidence that the overwhelming majority of the terminations of white employees for falsifying their time records occurred after Plaintiffs were terminated. For reasons that will become apparent, the Court disagrees, and finds that summary judgment is warranted on this theory.

First, Plaintiffs' evidence relating to possible violations of Defendant's policies does not reasonably suggest discrimination. Starting with the investigation process, the fact that the same exact process that had been used in other cases involving a claim of time-record falsification was not

---

[25]*Hysten v. Burlington N. Santa Fe Ry. Co.*, 2011 WL 892732, *13 (10th Cir. Mar. 16, 2011) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 246 & n.247 (1989), *superceded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-166, § 107(a), 105 Stat. 1074). The fact that Plaintiffs' claims are brought under § 1981, Title VII, and KAAD is immaterial, as the statutes' elements are the same. *See, e.g., Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991) ("[I]n racial discrimination suits, the elements of a plaintiff's case are the same . . . whether that case is brought under §§ 1981 or 1983 or Title VII."); *Vega v. Sprint Corp (PCS)*, 2004 WL 2414100, at *10 (D. Kan. Oct. 25, 2004) ("The Court applies the same analysis to claims under Title VII and the KAAD.").

[26]*Hysten*, 2011 WL 892732, at *13 (quoting *Price Waterhouse,* 490 U.S. at 250).

used in this case is not evidence of race discrimination for three reasons.[27] First, there is no evidence that Whittredge had ever investigated a case involving a claim of time-record fraud. Second, even if Whittredge had investigated a time-record-fraud claim before, this case is distinguishable from any earlier one because Whittredge discovered evidence indicating that employees were having other individuals clock them in, and he did so early in his investigation. Third, the record does not reasonably suggest that Whittredge is racially biased and that his bias affected either his report or investigation.[28] As a result, Defendant's investigation of Plaintiffs does not suggest that Plaintiffs' termination was racially motivated.

As for the basis upon which Bartz premised his termination decision (this type of dishonesty warrants termination), it too is not indicative of discrimination. The fundamental problem with the assertion that it is is that Defendant's disciplinary policy explicitly provides that an employee may be terminated for acting dishonestly, falsifying time records, or completing another employee's time records. Therefore, Bartz's decision to terminate Plaintiffs for falsifying time records was not a deviation from Defendant's policies, and, as a result, is not evidence of discrimination.[29]

The fact that Bartz disagreed with Human Resources' determination that three of the plaintiffs should be suspended, not terminated, is of no consequence. Plaintiffs have not pointed to, and the Court has not discovered, any formal or informal policy that Defendant had in place that would

---

[27]*Cf. Talwar v. Catholic Healthcare Partners*, 258 F. App'x 800, 806 (6th Cir. 2007) (suggesting that evidence of disparate investigation procedures may serve as evidence of discrimination).

[28]*Cf. Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1253 (10th Cir. 2006) ("We have recognized that a racially biased investigator can issue reports and recommendations influenced by his or her bias and thereby cause decision makers who rely on those reports to fire an employee unlawfully – a situation in which the biased investigator uses the supervisors as a cat's paw to effect his or her own biased designs.").

[29]*Cf. Cooper v. Wal-Mart Stores, Inc.*, 296 F. App'x 686, 695 (10th Cir. 2008) ("In order to establish pretext based on a procedural irregularity, a plaintiff must identify an applicable written or unwritten policy or procedure that the employer failed to follow.").

require the manager charged with determining the appropriate form of discipline to follow the recommendation made by Human Resources. In the absence of such a policy, the law allows employment officials to disagree about the proper form of punishment, and to do so without giving rise to an inference of discrimination.[30] Thus, Bartz's decision not to follow Human Resources' recommendation is not probative of discrimination.

Second, Plaintiffs' comparator evidence does not warrant an inference of discrimination. For the treatment of another employee to be evidence of discrimination, the other employee must have been similarly situated, which, under Tenth Circuit precedent, means that "they deal[t] with the same supervisor, [we]re subjected to the same standards governing performance evaluation and discipline, and [were] engaged in conduct of comparable seriousness."[31] Here, Plaintiffs' evidence fails for two reasons. The first is that because Bartz was not the decision maker in any of the disciplinary cases involving the employees discussed by Plaintiffs, the treatment of those employees is not probative on the question of whether Plaintiffs were discriminated against based on their race and/or sex.[32] The second is that the other employees' conduct is sufficiently distinguishable from Plaintiffs'. The determination of whether the compared conduct is sufficiently distinguishable hinges upon the inquiry of whether the employees' conduct differ in any significant respect from each other.[33] In their

---

[30]*Cf. Elmore v. Capstan Inc.*, 58 F.3d 525, 532 (10th Cir. 1995) ("That Appleby, a manager new to his position, wished to achieve a more disciplined operation than other supervisors had established does not compel an inference that the disparities in the treatment of Elmore and others were racially motivated, irrational, or lacking in credibility.").

[31]*E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 801 (10th Cir. 2007) (internal quotation marks omitted).

[32]*See, e.g., Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 922 (10th Cir. 2004) ("Comparison of one disciplinary action with another ordinarily is relevant only to show the bias of the person who decided upon the disciplinary action.").

[33]*See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1233 (10th Cir. 2000); *see also Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 900 (5th Cir. 2002) (stating that the conduct must be "nearly identical").

briefs, Plaintiffs argue that their termination must have been motivated by their race and/or sex because their conduct was far less egregious than that of their counterparts', as there is no evidence that they were ever compensated for time they did not work and they generally were only a few minutes late to work. The problem with this argument is that it ignores the fact that Plaintiffs' conduct is distinguishable from their peers' in at least one very significant way: Plaintiffs conspired together to develop a scheme to enable themselves to evade punishment while engaging in wrongful conduct. Because of this difference, Defendant was free to view Plaintiffs' conduct and the comparators' as not being equally unacceptable, and, thus, deserving of different punishments.[34] As a result, Defendant's treatment of other employees is not evidence of discrimination.

Third, the evidence relating to the termination rate of white employees for falsifying time records following Plaintiffs' termination is of no use to Plaintiffs. For such after-the-fact evidence to help Plaintiffs, at a minimum, two things would have to be true: first, Bartz would have to have played some role in the disciplinary process, and second, the evidence would have to show that Defendant was not terminating white employees who engaged in substantially similar conduct. Here, neither of these requirements are met. Accordingly, this evidence is not indicative of discrimination.

Fourth, the evidence in the record that Plaintiffs do not discuss in the argument section of their briefs, but is of a nature that one could conceivably argue that it evinces a racial basis, namely the little black sealer comments, management's regular observance of Plaintiffs' arrival, the fact Dawson

---

[34]*See, e.g., Kendrick*, 220 F.3d at 1233 ("A company must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct."); *cf. Antonetti v. Abbott Labs.*, 563 F.3d 587, 592 (7th Cir. 2009) (finding that the plaintiffs, who were terminated after it was discovered that they had lied about taking a meal break in order to be compensated for the time they were gone, were not similarly situated to another employee that had also went on the meal break and was compensated, but was not terminated, because that employee had not lied to his supervisors about taking the break); *Riggs v. Airtran Airways, Inc.*, 497 F.3d 1108, 1120-21 (10th Cir. 2007) (finding that the defendant's disparate treatment of younger workers did not show pretext because there was no evidence that the defendant viewed the plaintiff's offenses to be as egregious as her younger co-workers').

was replaced by a white employee, and Plaintiffs' subjective belief that they were discriminated against based on race, fails to raise a jury question on the issue of discrimination. Beginning with the comments first, because they are not attributed to any person who played a role in Plaintiffs' termination, they are properly classified as stray remarks, and, as a result, do not "establish that [Bratz's] decision was tainted by a discriminatory animus."[35] Next, the fact that management regularly observed Plaintiffs enter the facility is not evidence of discrimination because there is no evidence that management ever saw Plaintiffs arrive late. Without such evidence, there is no basis, other than rank speculation, for a reasonable jury to conclude that Defendant was aware of what was going on, yet chose to do nothing about it, which, at a minimum, is necessary to create an inference of discrimination.[36] With regard to the fact that Dawson was replaced by a white employee, it too is not probative of discrimination because there is no evidence that Bartz was involved with the process of deciding who should replace Dawson. Lastly, it is well established that Plaintiffs' subjective beliefs are insufficient to preclude summary judgment.[37] Therefore, the remaining evidence does not provide a basis for denying Defendant's motion for summary judgment on this theory.

In sum, Plaintiffs' evidence, viewed as a whole and in the light most favorable to them, is insufficient to raise a genuine dispute of fact as to whether Plaintiffs' race or sex played any role, much less a motivating role, in their termination. As a consequence, summary judgment should be granted on Plaintiffs' mixed motive wrongful termination theory.

---

[35]*Cuenca v. Univ. of Kan.*, 101 F. App'x 782, 788 (10th Cir. 2004).

[36]*Cf. Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1123 (8th Cir. 2006) (stating that the selective application of a policy could be evidence of pretext).

[37]*See, e.g., Aramburu v. Boeing Co.*, 112 F.3d 1398, 1408 n.7 (10th Cir. 1997).

**Pretext Theory**

To assess Plaintiffs' pretext theory, the Court applies the familiar *McDonnell Douglas Corp. v. Green*[38] burden-shifting framework: (1) Plaintiffs establish a prima facie case of discrimination; (2) Defendant offers a legitimate, nondiscriminatory reason for taking the action it did; and (3) Plaintiffs produce evidence that the proffered reason is pretextual.[39] To establish a prima facie case, Plaintiffs must show that: (1) they are a member of a protected class; (2) they are qualified for their position; (3) they suffered an adverse employment action; and (4) their termination occurred under circumstances that give rise to an inference of discrimination.[40]

Here, Plaintiffs have failed to meet their de minimus burden for establishing a prima facie case. For the reasons stated above, Plaintiffs' evidence is incapable of raising an inference that racial animus played any role in their termination. Thus, Plaintiffs have failed to establish a prima facie case of discrimination. Even if Plaintiffs could establish a prima facie case, though, their pretext theory would still not survive summary judgment because their evidence does not "show[] weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [Defendant's] proffered legitimate reason[] for its action such that a reasonable factfinder could rationally find them unworthy of credence."[41] Simply put, Plaintiffs' briefing merely shows that they disagree with

---

[38]411 U.S. 792 (1973).

[39]*See, e.g., Crow v. ADT Sec. Servs., Inc.*, --- F.3d ----, 2011 WL 1532536, at *3-4 (10th Cir. 2011).

[40]*See, e.g., Plotke v. White*, 405 F.3d 1092, 1099-1101 (10th Cir. 2005).

[41]*Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1222 (10th Cir. 2007) (internal quotation marks omitted). Plaintiffs concede, and case law supports, the point that terminating an employee because they acted dishonestly and/or falsified their time records is legitimate. *See, e.g., Hamilton v. Boise Cascade Express*, 280 F. App'x 729, 732 (10th Cir. 2008).

Defendant's decision to terminate them, not that the reason given for their termination is false. Accordingly, summary judgment should be granted on Plaintiffs' pretext theory as well.

### B. *Terms and Conditions Claim*

**Mixed Motives and Pretext Theories**

To prevail under either a mixed motives or pretext theory, Dawson must establish that she was subjected to an adverse employment action.[42] Generally, only acts that exact a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or . . . caus[e] a significant change in benefits" are considered to be adverse employment actions.[43] The determination of whether an action is an sufficiently adverse is made on "a case-by-case basis, examining the unique factors relevant to the situation at hand."[44]

Here, Dawson claims that Defendant's failure to assign her a team leader constituted an adverse employment action because it made her work more stressful, more demanding, and forced her to work additional hours. According to Dawson, the fact that her crew had between forty and fifty employees, most of whom were new and inexperienced, made it even more imperative that she have a team leader. In her briefing, Dawson concedes that her termination was not associated in any way with her not having a team leader and that she does not know whether white first-level managers worked similar amounts of overtime as her.

---

[42]*Wheeler v. BNSF Ry. Co.*, 2011 WL 1226935, at *6 (10th Cir. Apr. 4, 2011) (mixed motives theory); *Trujillo v. Univ. of Colo. Health Scis. Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998) (pretext theory).

[43]*E.E.O.C. v. C.R. England, Inc.*, --- F.3d ----, 2011 WL 1651372, at *7 (10th Cir. May 3, 2011) (internal quotation marks omitted).

[44]*Id.*

The Tenth Circuit's recent decision in the unpublished case of *Wheeler v. BNSF Railway Co.*[45], offers insight on the issue now before the Court. There, the plaintiff argued, among other things, that the defendant's practice of giving her work assignments with unusually short time requirements constituted an adverse employment action. According to the plaintiff, the defendant's practice had forced her to work through lunch periods and breaks. Citing to the fact that the plaintiff had failed to produce evidence regarding what types of assignment similarly-situated employees received and that the plaintiff had never been reprimanded for failing to meet a deadline, the Tenth Circuit concluded that there was no objective basis upon which a jury could conclude that the defendant had subjected the plaintiff to an adverse employment action, and thus affirmed the district court's granting of summary judgment on the plaintiff's mixed motives race discrimination claim.[46]

In addition to *Wheeler*, other circuit court cases provide guidance on the issue. Among other things, these cases show that it is not sufficient for a plaintiff to merely assert that the challenged action resulted in her having an increased work load; rather, she must also produce evidence showing that the action significantly increased her level of work relative to similarly-situated employees or prior work loads.[47] Additionally, they reveal that an employment action that modestly increases the plaintiff's stress level is not an adverse employment action.[48]

---

[45] 2011 WL 1226935.

[46] *Id.* at *9.

[47] *See, e.g., Humbles v. Principi*, 141 F. App'x 709, 711-12 (10th Cir. 2005); *see also Diaz v. AIG Mktg., Inc.*, 396 F. App'x 664, 667 (11th Cir. 2010) (noting that increasing an employee's workload is not an adverse employment action because "[i]t is not [the court's] role to second-guess AIG's business decisions, and changes to an employee's work assignments are rarely sufficiently 'adverse' to warrant scrutiny under the anti-discrimination laws"); *Benningfield v. City of Houston*, 157 F.3d 369, 376-77 (5th Cir. 1998) (stating that "assign[ing] an unusually heavy work load" did not constitute an adverse employment action).

[48] *See, e.g., James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004); *see also Tapia v. City of Albuquerque*, 170 F. App'x 529, 534 (10th Cir. 2006) (monitoring by employer of the plaintiff, which caused the plaintiff stress, was not an adverse employment action).

-17-

With the above precedent in mind, and in light of the record in this case, the Court concludes that Dawson has failed to put forth evidence sufficient to raise a jury question as to whether she suffered an adverse employment action when her requests for a team leader were denied. To begin with, Dawson's evidence merely indicates that not having a team leader made her job more stressful and demanding, not that it made her job significantly more stressful and demanding than her counterparts'.[49] Further, there has been no showing regarding how much more Dawson worked than her fellow first-level managers. Thus, due to Dawson's failure to produce evidence demonstrating how not having a team leader made her job substantially different than her peers', the fact that every other first-level manager under Hans had a team leader is not probative on the issue of whether an adverse action was taken against her.[50] Lastly, it is uncontroverted that Dawson's termination was unrelated to her not having a team leader. Therefore, looking at the evidence in this case as a whole and in a light most favorable to Dawson, the Court concludes that there is no basis upon which a reasonable jury could conclude that Defendant's decision not to assign Dawson a team leader had a significant impact on her employment status or benefits. Accordingly, summary judgment should be granted on Dawson's terms and conditions claim.

**IT IS THEREFORE ORDERED** that Defendant's motion for summary judgment in Case No. 08-2493 (Doc. 133) is hereby GRANTED.

---

[49]*See, .e.g., Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999) ("Absent evidence that a new position is significantly more stressful than the last, vague allegations of stress resulting from reassignment cannot support a claim of discrimination under Title VII.").

[50]*See, e.g., Piercy v. Maketa*, 480 F.3d 1192, 1203-04 (10th Cir. 2007) (stating that the challenged action must make the plaintiff's job duties "*substantially* different" than their peers' in order for it to amount to an adverse employment action (emphasis in original)).

**IT IS FURTHER ORDERED** that Defendant's motion for summary judgment in Case No. 08-2494 (Doc. 31) is hereby GRANTED.

**IT IS FURTHER ORDERED** that Defendant's motion for summary judgment in Case No. 08-2495 (Doc. 22) is hereby GRANTED.

**IT IS SO ORDERED**.

Dated this 27th day of June, 2011.

                                                        ERIC F. MELGREN
                                                        UNITED STATES DISTRICT JUDGE